**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY** | ) | |
| **COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **3:16-cv-0233-CWR-FKB** |
| **HALLIBURTON ENERGY SERVICES, INC.** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |


**EEOC MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.   INTRODUCTION...................................................................................................1

II.  PLAINTIFF'S STATEMENT OF FACTS ........................................................1

    A.  Anderson Worked for Halliburton in Libya and Algeria ...............................1

    B.  Anderson Continued Taking Pain Medication after His Knee Surgery .......................2

    C.  Anderson Informed Halliburton of his Medical Condition in 2013 ...........................3

    D.  Anderson Was Medically Cleared in 2013 But Was Denied Employment.................3

    E.  Anderson Filed a Charge with the EEOC ...........................................................4

    F.  At Mediation, Halliburton Promised to Rehire Anderson……………………………5

    G.  Halliburton Promised Its 2013 Medical Disposition Would Not Be an Issue.............5

    H.  Halliburton Signed the Mediation Settlement Agreement ...............................6

    I.  Anderson Agreed to a Position in Iraq at a Lower Salary ...............................6

    J.  Anderson Accepted Halliburton's Offer to Work in Basra, Iraq ...............................7

    K.  Anderson Passed All Medical Pre-Employment Screenings in 2014 ...........................7

    L.  Dr. Conte and Halliburton Refused to Clear Anderson to Work in Iraq ...................9

        1.  May 7, 2014 Conference Call with Halliburton's Decision Makers ..........................9

        2.  May 12, 2014 Conference Call ................................................................9

        3.  Halliburton Denied Anderson's medical clearance to work in Iraq ..........................10

    M.  EEOC Expert Dr. Yarborough Refutes Conte's Opinions .........................................11

        1.  An Abundance of Medical Resources Were Available in Basra, Iraq........................11

        2.  Anderson's Prescription Would be Valid and Respected Within Iraq ......................12
        3.

    N.  Halliburton Had a Plethora of Available Positions ......................................................13

    O.  Halliburton Had Positions Available in Many Business Divisions.............................13

    **P. Halliburton Simply Stopped Considering Anderson for Rehire** ..................................**16**

**III. LEGAL ARGUMENT**................................................................................................**16**

    **A. Standard of Review**..................................................................................................**16**

    **B. Defendant Failed to Fulfill Its Obligation Under the MSA**....................................**17**

        1. The MSA is Ambiguous .........................................................................17

        2. Parole Evidence is Admissible.................................................................18

        3. Under the MSA, Defendant Was Required to Rehire Anderson .................................20

        4. There was no Valid Reason for Dr. Conté to Disqualify Anderson ...........................21

            a. Anderson Fulfilled the Medical Clearance Standards ...........................................22

            b. Anderson Successfully Performed the Position.....................................................23

            c. Dr. Conte's Determination Was Not Medically Sound .........................................23

        5. Defendant Had Positions Available .........................................................26

    **C. Defendant's Performance Was Not Impossible** ......................................................**28**

        1. An Impossibility Defense Requires Unforeseen Circumstances ................................29

        2. Dr. Conte's Failure to Medically Clear Anderson Was Not Unforeseen ...................30

        3. Halliburton Chose Not to Fulfill Its Obligation under the MSA ...............................31

    **D. The Unclean Hands Doctrine Does Not Apply to the EEOC In This Case** ...............**31**

        1. The Unclean Hands Doctrine is an Equitable Defense to a Request for An Equitable Remedy .................................................................................32

        2. The Unclean Hands Doctrine Does Not Apply to the EEOC ....................................32

        3. Even if the Unclean Hands Doctrine was Applicable, Defendant has failed to Establish Willful Misconduct ...................................................................33

**IV. CONCLUSION** ........................................................................................................**34**

## I. __INTRODUCTION__

The EEOC brought this suit after Defendant, Halliburton Energy Services, Inc., ("Defendant" or "Halliburton"), breached the terms of a Mediation Settlement Agreement (MSA) entered between the EEOC, Jason Anderson ("Charging Party" or "Anderson") and Halliburton on January 14, 2014. The MSA resolved Anderson's EEOC discrimination charge alleging Halliburton's failure to hire him based on his disability. Under the terms of the MSA, Halliburton agreed to rehire Anderson "as a Project Specialist-Safeguard III; BC503-ESG or comparable position based on successful completion of pre-employment screening." (Pl. Ex. 10 to Anderson Dep.) It is undisputed that Halliburton failed to rehire Anderson, thereby failing to fully satisfy its obligations under the MSA. Halliburton now seeks to excuse its nonperformance. Each of Halliburton's cited reasons for its failure to comply with the MSA is without merit. Therefore, Halliburton's Motion for Summary Judgment should be denied.

## II. __STATEMENT OF FACTS__

Halliburton provides services to major oil companies such as BP, Shell, and Exxon. (LeBlanc Dep., 10:1–13). The company, which is organized along numerous product service lines, such as cementing, drilling, exploration and production (*Id*., 11:9-17), acquired Boots & Coots ("Boots") in 2010. (Graffeo (30(b)(6) Dep., 71:3-5). In 2014 Halliburton employed almost 85,000 persons. (Ex. C, Def Interrog. Resp., p 3).

### A. Anderson Passed Pre-Employment Screening and Worked for Halliburton in Libya and Algeria

Anderson worked for Boots and then Halliburton as a Project Specialist-Safeguard II, Firefighting HSE Supervisor in Algeria and Libya from 2008 until March 2011, when he was terminated during a reduction-in-force.  (Anderson Dep. 43:7–14; 51:1–8; 67:3–68:5; Pl. Ex. 3 to

Graffeo 30(b)(6) Dep).[1]

Before beginning his job with Boots in 2008, Anderson passed a pre-employment screening process (Anderson Dep., 41:10–17) consisting of a medical examination, drug urinalysis, and a functional capacity exam (FCE). (*Id*., 41:23-42:5). As part of the FCE Anderson was required to complete various exercises that mimic a twelve-hour workday within a one-hour period.  *(Id.).* Anderson disclosed that he was taking Percocet and Valium for knee pain. (*Id*., 175:17–176:1). Both Algeria and Libya are regions with limited medical resources (LeBlanc 30(b)(6) Dep., 61:24-62:10), but Anderson had no issues obtaining his medication nor any other medical issues while working there. (Anderson Dep., 263:18–24; 264:10–15; Ex. F, EEOC000625).

**B.**  Anderson Continued Taking Pain Medication after His Knee Replacement Surgery

On August 1, 2012, Anderson underwent total knee replacement surgery due to degenerative conditions in his right knee.  (Anderson Dep., 152:11-19). His surgery was a success, with no complications. At the time, he was working for CUDD Well Control in Texas. (*Id.,* 56:22-57:5). After a short recovery period, his surgeon released him to work with no restrictions. He continued taking the narcotic medication Percocet for pain management, but only on an as needed basis. (*Id.,* 141:3-142:6).[2]

---

[1] Anderson's position was absorbed by Halliburton during the acquisition. (Anderson Dep., 63:2-63:6).

[2] Anderson had taken Percocet or Oxycodone for several years before this surgery due to back and knee pain. (Anderson Dep. 160:9-24, Pl. Ex. 17 of Anderson Dep).

**C.** Anderson Informed Halliburton of his Medical Condition When He Applied and Was Hired to Work in Libya in 2013.

In January 2013, Anderson re-applied for work at Halliburton. (Anderson Dep., 57:11-58:5). Halliburton offered, and Anderson accepted, a position in Libya as a Project Specialist III/Well Control Specialist. (Anderson Dep., 64:22–65:5; 66:9–21; Oliver 30(b)(6) Dep., 25:8-11; Ex. H, EEOC000628 through EEOC000629). Anderson informed Leslie Finnegan, Manager for International Operations, about his knee replacement and that he had been cleared to return to work with no restrictions. Finnegan assured him that his medical condition would not be a problem and would not affect his job duties. (Pl. Ex. 7 to Anderson Dep.).

**D.** Anderson Was Medically Cleared During His 2013 Pre-employment Screening but Was Denied Employment Due to His Use of Percocet for Pain Management

After Anderson accepted the offer, Halliburton required him to submit to a post-offer physical examination (LeBlanc 30(b)(6) Dep., 21:1-6) by a physician chosen by Halliburton, Dr. Nathan Williamson,[3] in Laurel, Mississippi. (Anderson Dep., 134:14-23; Ex. I, EEOC000772 through EEOC000783). During that physical exam, Anderson and Dr. Williamson discussed the physical requirements and working conditions of the position. (*Id.,* 136:19-137:21). Dr. Williamson and Dr. Ross Ward of Southern Bone & Joint Specialist, PA cleared Anderson to work. (Ex. I, EEOC000772 through EEOC000783; Ex. J, EEOC000821 through EEOC000823).

Rather than accepting these medical opinions, Halliburton chose to consult Dr. Robert Conte, Halliburton's Corporate Medical Director, who reviewed Anderson's records and noted that Anderson was taking Percocet four times a day (LeBlanc 30(b)(6) Dep., 15:5-6; Pl. Ex. 5 of Conte Dep.). Dr. Conte insisted on a full report from Anderson's doctor as to his ability to do the functions of his job and an FCE. (Pl. Ex. 21 of Oliver 30(b)(6) Dep.). Anderson passed the FCE.

---

[3] Anderson states Dr. Welch examined him in 2013 but records show it was Dr. Nathan Williamson.

(Pl. Ex. 16 to Anderson Dep). At Halliburton's request, Anderson was also seen by his knee surgeon, Dr. Ross Ward, who also cleared him for work. (Anderson Dep., 156:2-158:9; Ex. J, EEOC000821 through EEOC000823)

Despite these clearances, Dr. Conte determined that Anderson was not fit to travel internationally for at least four months due to his medical condition and his prescription use of Percocet. (Oliver 30(b)(6) Dep., 40:14-21). Dr. Conte opined that the use of narcotics is forbidden in most Middle Eastern countries. Dr. Conte also voiced concern about on-the-job safety risks associated with the use of prescribed narcotics. (Pl. Ex. 5 to Conte Dep.). Halliburton did not question Dr. Conte's decision not to clear Anderson to work in 2013 nor was there any follow up communication with Anderson or his local medical providers. (LeBlanc 30(b)(6) Dep., 44:10–45:2). Because of Dr. Conte's failure to give international clearance, Defendant withdrew its offer of employment and terminated Anderson effective April 15, 2013. (Oliver 30(b)(6) Dep., 29:17-30:1)).

**E.** Anderson Filed a Charge of Discrimination with the EEOC based on Defendant's Failure to Hire Him and Agreed to Mediation

Anderson filed a Charge of Discrimination with the EEOC in October 2013 (Anderson Dep., 70:10–71:6; Pl. Ex. 3 of Anderson Dep.) alleging Halliburton had discriminated against him by failing to hire him based on his age and disability. Anderson agreed to voluntary mediation of the Charge, if Halliburton would likewise agree.

Halliburton assigned Senior Employee Relations Representative, Rebecca Oliver ("Oliver"), to investigate and respond to the Charge. (Oliver 30(b)(6) Dep., 103:10-16). Oliver investigated, communicated with Dr. Conte, and learned of his concerns. (Pl. Ex. 21 of Oliver 30(b)(6) Dep.) Nevertheless, Halliburton agreed to participate in the EEOC's Mediation Program. (Oliver (30(b)(6) Dep., 13:24-15:11; Pl. Ex. 4 to Anderson Dep.). The mediation,

facilitated by EEOC Mediator Linda Walker, was held on January 14, 2014. (Pl. Ex. 7 to Walker Dep.).

    **F.**  At Mediation Halliburton Promised to Rehire Anderson in a Project Specialist or Comparable Position

During the mediation, Oliver made several representations to Anderson and the EEOC. Oliver agreed that Halliburton would rehire Anderson as a Project Specialist III. (Anderson Dep., 89:11–90:10). Oliver promised Halliburton would find Anderson a job-- whether overseas or in the U.S. (*Id.,* 188:22–189:5; Walker Dep., 92:11–93:1). Prior to the mediation, Halliburton had examined Anderson's resume and assessed his skills and experience and believed Anderson was a good fit for the company. (Graffeo 30(b)(6) Dep., 42:21–43:8). Halliburton had full knowledge of Anderson's experience in well control and intended to keep him in the response department[4]. (Oliver 30(b)(6) Dep., 43:14–22; Anderson Dep., 90:3–10; Pl. Ex. 2 to Anderson Dep.). Halliburton had critical projects coming up in the Middle East and Anderson had the capabilities to meet those project requirements. (Graffeo 30(b)(6) Dep., 36:34-37:24). Oliver also stated that Anderson would work within the Completion and Production Division in the product service line called Boots. (*Id.,* 25:1–18).

    **G.**  At Mediation Halliburton Promised That Dr. Conte's 2013 Medical Disposition Would Not Be an Issue

Anderson specifically told Walker that he did not want Dr. Conte involved in the pre-employment screening. (Anderson Dep., 102:10–19). Oliver stated she did not know what the issue was previously but reassured Anderson and Walker that Dr. Conte no longer worked for Defendant and that his previous disposition would not be an issue. (*Id.,* 94:21–95:10; Walker Dep., 39:19-40:15). Anderson reminded Oliver he had previously worked for Halliburton

---

[4] In the well control industry, the Response Team is part of emergency services. (Anderson Dep., 90:25-91:1)

(Anderson Dep., 78:3–12), and stated his physical and medical condition was the same as it was when he previously worked for Halliburton in the Middle East. (Walker Dep., 41:20–42:5).

Oliver discussed the pre-employment screening requirement with Anderson and Walker (*Id.,* 39:6–11) and stated Halliburton was not concerned about Anderson's underlying medication condition or his upcoming pre-employment screening. (Oliver 30(b)(6) Dep., 39:7– 40:21). Oliver stated that she would personally oversee Anderson's pre-employment screening and rehire process. (Walker Dep., 39:12 – 40:24).

**H.** Halliburton Signed the Mediation Settlement Agreement Obligating It to Rehire Anderson

On January 14, 2014, at the conclusion of the mediation, all parties agreed and signed a written Mediation Settlement Agreement (MSA) providing Halliburton would pay Anderson $40,000 and rehire him as a Project Specialist III or in a comparable position at a base salary of $110,000, conditional on Anderson passing pre-employment screening. (Oliver 30(b)(6) Dep., 37:7–14; Pl. Ex. 10 to Anderson Dep.). The EEOC, as a party to this agreement, agreed to terminate its investigation of the Anderson's charge.  The EEOC also agreed to give Defendant notice and opportunity to cure any alleged compliance violations prior to seeking court enforcement of the agreement. (*Id*).[5]

**I.** Anderson Agreed to a Position in Iraq at a Lower Salary and the Mediation Agreement Was Redrafted

On January 15, 2014, Oliver contacted Graffeo to secure a position for Anderson. (Ex. C, p. 4). Graffeo contacted Finnegan, who had previously worked with Anderson; Finnegan assured her that Anderson had the experience and capability to do the Project Specialist job. (Graffeo 30(b)(6) Dep., 85:21–25). This available position was in Iraq but the base salary, $100,000, was

---

[5] Halliburton did pay Anderson $40,000 per the mediation agreement. (Walker Dep., 67:12–20, Pl. Ex. 12, Anderson Dep.).

lower than the $110,000 provided for in the MSA. (Oliver (30(b)(6) Dep., 51:2-51:18; Pl. Ex. 11 to Graffeo 30(b)(6) Dep.). Anderson agreed to accept the lower salary because his total compensation, with premium pay and uplifts, would be similar. (Anderson Dep., 123:8–19; Walker Dep., 64:10-65:17). Walker redrafted the mediation agreement and Anderson, the EEOC, and Halliburton signed it. (Walker Dep., 65:9–12; Oliver 30(b)(6) Dep., 58:13–59:5; Pl. Ex. 11 to Anderson Dep).

**J.** Anderson Accepted Halliburton's Formal Offer to Work in Basra, Iraq

On February 26, 2014, Anderson was extended a written offer of employment. (Graffeo 30(b)(6) Dep., 90:2–14; Pl. Ex. 13 to Anderson Dep) to work as a Prevention Specialist III-BC503ESG[6] in Al-Basra, Iraq, with a potential start date of April 1, 2014. (Pl. Ex. 14 to Anderson Dep). In addition to life insurance, a retirement plan, and room and board (Oliver Dep., 38:1–8, 41:3–6; Graffeo 30(b)(6) Dep., 59:11–15; Pl. Ex. 15 to Walker Dep.), Anderson was to receive a daily commuter workforce allowance, operating day rate, and premium pay. (Graffeo Dep., 27:11–28:17; Pl. Ex. 2 to Oliver Dep.). Anderson signed the offer of employment on March 3, 2014.  (Anderson Dep., 129:7–16; *Id.* Ex. 13).

**K.** Anderson Passed All Medical Pre-Employment Screenings

Halliburton required a pre-screening for all international employees, and customarily used the vendor Corporate Health Resources, Inc. ("CHR") to handle such clearances. (Oliver Dep., 15:5–19; LeBlanc 30(b)(6) Dep., 14:15–20; 21:1–6). In 2014 Ellen LeBlanc was responsible for coordinating the pre-screening process; she was not made aware that this position was a term of a mediation agreement. (LeBlanc Dep., 17:15–18). Dr. Conte, who (contrary to

---

[6] The title of the job had changed from Project Specialist to Prevention Specialist, but the duties remained the same.

Oliver's representations) was still Halliburton's Corporate Medical Director, advised CHR. (LeBlanc 30(b)(6) Dep., 12:14-25).

On March 14, 2014, Anderson submitted to a medical exam conducted by Dr. Jerry Welch, a doctor chosen by Halliburton. Dr. Welch cleared Anderson for all positions (onshore and offshore[7]), and in regions with limited medical resources. (Anderson Dep., 134:14–135:1; Pl. Ex. 15 to Anderson Dep). Anderson's medical condition was the same as it was when he previously worked for Halliburton. (Walker Dep., 41:20–42:5). Anderson disclosed that he was taking Oxycodone[8] and Diazepam on an as-needed basis. (Anderson Dep., 141:3–142:6). Dr. Welch cleared Anderson to work. (Conte Dep., 73:9-11; Anderson Dep., 146:24–147:1).

Defendant and CHR also sent Anderson to Dr. Ross Ward of Southern Bone & Joint, who also medically cleared Anderson to work. (Anderson Dep., 156:2–158:9; Ex. J, EEOC000821 through EEOC000823). Dr. Conte then requested an FCE, which was performed by physical therapist, Cody Rogers, and a report from Anderson's treating physician. Rogers performed the FCE, discussed the working conditions of the desert with Anderson (Conte Dep., 63:16-64:7; Anderson Dep., 150:10–151:4), and recommended him for the position because he could perform all test items without complaints of pain and demonstrated no limitations. (Anderson Dep., 147:22–152:3; Ex 16 to Anderson Dep). Dr. Conte reviewed the FCE but was not satisfied. (Conte Dep., 85:16-22, 87:5-11). At Dr. Conte's request, Anderson then provided a letter from his personal physician, pain management specialist Dr. Vivek Barclay, who stated

---

[7] Onshore drilling relates to drilling deep holes under the earth's surface to extract natural resources (usually oil and gas)., whereas offshore drilling relates to drilling underneath the sea bed. Nate Richards, *what is onshore drilling versus offshore drilling?* November 22, 2017, http://www.entranceconsulting.com/2013/10/23/onshore-versus-offshore-drilling/.

[8] Percocet contains a combination of acetaminophen and oxycodone. (Ex. P, Dr. Yarborough Report, p.6).

that he prescribed Oxycodone and Valium for Anderson for lower back pain, sacroiliitis, and chronic bilateral knee pain. (Ex. O, EEOC000438).

**L.**  Dr. Conte and Halliburton Refused to Clear Anderson to Work in Iraq

On April 22, 2014, after Anderson had passed the physical exam, obtained clearance from his orthopedic surgeon, provided a letter from his personal doctor, and passed an FCE, Dr. Conte reviewed Anderson's medical records. (Ex. C, Def Interrog. Resp., p. 5). Dr. Conte claimed to have concerns regarding Anderson's use of narcotics. (Conte Dep 89:21-90:18). Dr. Conte testified in deposition it indicated to him there was some type of medical condition that Halliburton would probably not be able to accommodate in high-risk countries, such as Iraq, due to lack of adequate medical care available. (*Id.*).

      1.  *Dr. Conte Addressed His Unfounded Concerns in a May 7, 2014 Conference Call with Halliburton's Decision Makers*

In a conference call with Halliburton and CHR on May 7, 2014, Dr. Conte provided his rationale for his hesitancy to clear Anderson to work in Iraq. (Ex 6 to LeBlanc dep). Dr. Conte was leaning on denying Anderson medical clearance again.[9] (Oliver 30(b)(6) Dep., 61:3–14).

Dr. Conte advised that Anderson could work in non-Middle Eastern countries and the United States. (Conte Dep., 46:25-47:11). All parties agreed to reconvene after CHR had spoken to Anderson about alternate medications he could take other than narcotics. (LeBlanc (30(b)(6) Dep., 31:13–22).

      2.  *On May 12, 2014, Dr. Conte Reiterated His Unfounded Medical Concerns and Added Unsubstantiated Legal Concerns*

---

[9] Dr. Conte did not tell Halliburton details about Anderson's underlying medical condition--indeed, Dr. Conte himself did not know any details. And Halliburton was not aware of any underlying medical condition that Anderson had. (LeBlanc 30(b)(6) Dep., 29:7–12).

A second conference call was held on May 12, 2014 attended by Oliver, Dr. Conte, LeBlanc, and Stephanie Jackson, Defendant's Senior General Counsel. (Oliver Dep., 22:25–23:12). Dr. Conte reiterated his recommendation to deny Anderson medical clearance based on Halliburton's inability to provide Western-style medicine in Iraq.[10] (Oliver 30(b)(6) Dep., 68:13–22). Dr. Conte also stated that Anderson may get arrested or go to jail if caught with his medication. (Conte Dep., 37:14-38:8). However, Dr. Conte admitted in his deposition he has limited knowledge of Iraqi law and he only knows what doctors who practice in Iraq have told him. (Conte Dep., 36:14 – 23).

3. *Despite Dr. Conte's Unsubstantiated Concerns and its Obligation to Rehire Anderson, Halliburton Denied Anderson's Medical Clearance to Work in Iraq*

Regardless of Anderson's previous medical clearances and access to adequate medical resources in Iraq, Dr. Conte made the recommendation to deny Anderson's medical clearance. (Oliver 30(b)(6) Dep., 76:18–20). Halliburton accepted Dr. Conte's recommendation and decided not to rehire Anderson to work in regions with limited medical resources. (Oliver Dep., 22:25–23:12, Graffeo 30(b)(6) Dep., 96:10 – 18; LeBlanc 30(b)(6) Dep., 17:14–23; Ex 18 of Anderson Dep).

Dr. Conte admitted he did not perform his own independent research or follow-up with Anderson's local medical providers. (Conte Dep., 32:22 – 33:12; 60:11–16). No one from Halliburton sought a second opinion about Dr. Conte's disposition. (Oliver Dep., 23:20–24:9). Oliver notified Anderson on May 14, 2014 that he was not medically cleared to work in Iraq. (Anderson Dep., 169:19–25; Pl. Ex. 19 of Anderson Dep.).

---

[10] Yet, Halliburton has its own medics on location. (Conte Dep., 52:14 – 24). Dr. Conte never expressed concern that Anderson was at substantial risk of needing to be Life-Flighted out of Iraq. He only spoke generically. (Oliver Dep., 26:21 – 27:2). Dr. Conte never described with any specificity what risk would exist if Anderson worked in Iraq. (Oliver Dep., 27:3 – 15).

**M.** EEOC Expert Dr. Yarborough Contradicts and Refutes Conte's Opinions and the Basis for His Opinions

As shown by the EEOC's experts, Dr. Conte's lack of knowledge of the critical facts and unfounded concerns render his medical disposition unreliable.

1. *An Abundance of Medical Resources Were Available in Basra, Iraq at the Time of Anderson's 2014 Pre-Employment Screening*

The EEOC retained expert, Charles Yarborough, MD, MPH, FACOEM, FACPM, CIME, a physician who is Board Certified in Internal Medicine and Occupational Medicine and has been responsible for international workplace health for several multinational companies. It is Dr. Yarborough's opinion, expressed in his expert report and rebuttal report (See Ex. P, Dr. Yarborough Report; Ex. Q, Rebuttal Report) that Anderson was medically qualified for employment and fit for working in regions with so-called limited medical resources, although, according to Dr. Yarborough, the position in Iraq probably would not fit that description. (Ex. P, Dr. Yarborough Report, p. 5) Dr. Yarborough bases his opinion on the health risk of Anderson's job assignment, the medical risks of the destination itself, and the process of the decision-making for medical clearance. (*Id.,* pp. 4-6) Dr. Yarborough concludes Anderson was not a "direct threat" as defined by federal regulations to the safety and health of himself or others. Finally, he concludes that withdrawal of the job offer by Halliburton due to a supposed medical threat and risk of the location for the overseas assignment was unreasonable because the assessments of his medical risk and site resources were inaccurate. (*Id.).* According to Dr. Yarborough, International SOS ("ISOS") operated three medical clinics in Basra, which have 24/7 Intensive Care Units, emergency ward facilities, diagnostic and hospital services, etc. Halliburton also authorizes medical evacuations if necessary. (See Dr. Yarborough Expert Report, Ex. 3, p.7; Ex. R,    EEOC000754    through    EEOC000756,    EEOC000757    through    EEOC000758).

Halliburton has admitted during discovery in this case that there are medical resources available for its employees deployed in Iraq. Halliburton contracts with ISOS to provide medical services to its employees in Iraq. (Graffeo Dep., 16:5-16:8). Halliburton claims that ISOS does not provide medicine like a pharmacy. (LeBlanc 30(b)(6) Dep., 58:23-59:6) However, Dr. Conte admitted that ISOS has clinics all over the world, including Iraq and in remote areas, and Halliburton has contracted with ISOS for many years. (Conte Dep., 36:24-37:8).

ISOS has the equipment to serve the medical needs of Halliburton employees in Iraq. (LeBlanc 30(b)(6) Dep., 64:13-21; Ex. T, EEOC000759 through EEOC000763). ISOS provides case management services to serve the medical needs of Halliburton employees in Iraq. (*Id.* At 65:33-65:25) In fact, ISOS has a clinic at the main Halliburton base in Burjasia, Iraq. (LeBlanc 30(b)(6) Dep., 66:1-4). Dr. Conte did not seek advice from any representative of ISOS on the use of narcotics and medicine in Iraq. (Conte Dep., 40:24 – 41:3).

In sum, all medical information and records do not support the decision to disqualify Anderson for employment in Iraq.

2. *Anderson's United States Issued Prescription Would be Valid and Respected Within Iraq*

The EEOC has also retained Thomas W. Donovan, Managing Partner and founder of Iraq Law Alliance, PLLC, a legal consulting firm with focus on International Law, Petroleum and Natural Gas Law, as an expert in this case.

Donovan, in his expert report, refutes Dr. Conte's narcotic legality concern. (Ex. U, Donovan Expert Report, pp. 2-3) Donovan advises that Percocet and Valium are legal in Iraq with a valid prescription. Under the Iraqi Narcotics Law Percocet and Valium are Schedule I drugs and entirely legal with a corresponding, current and valid prescription. (*Id.*, p. 5). Second, The Iraqi Criminal Law (Law No. 11 of 1969) (Iraqi Criminal Law) does not criminalize drugs

which require a prescription. Iraqi Customs Law (Law No. 12 of 2010) (and its supporting amendments) do not disallow the importation of prescription medicine with a valid prescription. (Donovan) Lastly, Donovan echoed Dr. Yarborough's conclusion regarding the availability of licensed medical professionals at every oil and gas camp in Iraq which is maintained, staffed and utilized by foreign companies (such as Halliburton). (*Id.*, p. 7). According to Donovan, under the Iraqi practice of petroleum extraction, foreign petroleum operators are required to supply Iraqi and foreign employees with medical services at these camps. The operators pay the fees of the remote medical companies, and the operators are then paid back the cost of the medical service in extracted crude oil or cash, whichever the operator elects. (*Id.*, p. 8).

**N.**_As a Multinational Corporation, Halliburton Had a Plethora of Available Prevention Specialist Positions and Other Available Comparable Positions_

After Halliburton withdrew its offer for the job in Iraq, Oliver told Anderson she would find him a position in the United States. (Anderson Dep., 116:4–13; Pl. Ex. 25 to Oliver 30(b)(6) Dep). Halliburton is a multinational oil and gas services organization, (LeBlanc Dep., 10:1 – 13). Halliburton has two major headquarters: one in Houston and one in Dubai, and in 2014 employed almost 85,000 persons. (Ex. C, Def Interrog. Resp., p 3). Anderson was willing to work any location Halliburton assigned him. (Anderson Dep., 209:2 – 6). In fact, Anderson found jobs on Halliburton's website as a Project Specialist Safeguard III and notified Oliver, but never heard back from her. (*Id.*, 193:22 – 194:6).

**O.** _Halliburton Had Positions Available in Many Business Divisions Worldwide and in the United States_

Dr. Conte admitted that Anderson could work in non-Middle Eastern countries. (Conte Dep., (Conte Dep., 46:25-47:11). As a global entity, Halliburton had a plethora of positions that were comparable to a Project or Prevention Specialist III position.

Halliburton is divided into three divisions: (1) Completion and Production (which includes several product service lines, (2) Drilling and Evaluation Division (which includes different service lines, and (3) Consulting and Project Management. (Graffeo 30(b)(6) Dep., 23:1 – 15). Halliburton offers multiple product service lines, including: cementing, production enhancement, multi-chem, artificial lift, drilling and evaluation; Sperry, which is directional drilling, and Boots, which is consulting and project management. (Oliver Dep., 11:19 – 12:4). While Boots is only one Product Service Line, Graffeo admits that she was asked to only look at Boots for a position for Anderson. (Graffeo Dep., 32:12 – 33:1).

In addition to the availability of overseas positions, there were positions available stateside for which Anderson was qualified.  Brooklyn Brooks, in Human Resources, told Anderson that she would find him a job in the U.S. as a Project Specialist Safeguard III. (Anderson Dep., 189:14-8). Bill Sheridan, HR Manager of Halliburton's Response Division, told Anderson that Halliburton had available positions in special services in well control. (Anderson Dep., 178:12-180:8). Oliver alleges she sent Anderson's resume to Sheridan (Oliver (30(b)(6) Dep., 83:21-84:4; Pl. Ex. 21 of Anderson Dep.) but Anderson never heard anything further from Sheridan or Oliver about such a position. (Anderson Dep., 216:10-18). Oliver also claims she emailed Anderson's resume to Mary Bullman, who oversaw hiring in the Shreveport, Louisiana area. (Oliver (30(b)(6) Dep., 126:17 – 127:3). Graffeo asked Anderson if he was interested in relocating because Halliburton had a lot of jobs in 2014 in Texas, Oklahoma, North Dakota, and Pennsylvania. (Graffeo Dep., 33:2-35:4). Halliburton also has a Denver business unit. (Graffeo 30(b)(6) Dep., 69:25 – 70:7). Anderson was not offered any of these positions.

On June 18, 2014, Anderson interviewed for an open engineering position in Russia with Roslyn Saulsberry, who was over Halliburton's Engineering Department. (Anderson Dep., 200:4

– 13; 203:1 – 4). Anderson had engineering experience from his previous position with CUDD as a Well Control Specialist. (*Id.,* 200:14 – 201:7). At the end of the interview Saulsberry told Anderson that he had the Russia position and she was going to draft the letter of employment. (*Id.,* 202:11 – 22). Anderson was notified the day after his interview, however, that Halliburton, "would not be pursuing his application." (*Id*., 212:6 – 19; Ex. C, Def Interrog. Resp., p. 6).

During this same interview, Saulsberry acknowledged there were vacant Prevention Specialist positions in the Gulf of Mexico and Australia. Anderson was never offered any of these available positions. (Anderson Dep., 204:4 – 13, 208:1 – 14).

Since May 2014 Halliburton has filled at least five BC-503 positions (Prevention Specialist) in Iraq, Algeria, Australia, and Singapore. (Oliver Dep., 36:8 – 14; Graffeo (30(b)(6) Dep., 46:8 – 16). Halliburton offered Louis Landry a BC-503 position in Singapore in March 2014, (Oliver Dep., 31:12 – 17), despite its obligation to rehire Anderson. In another instance, Halliburton claims that Landry was hired for a special services position.[11] (Graffeo 30(b)(6) Dep., 14:25 – 16:6). Halliburton hired Matthew Hinshaw for an Iraq BC-503 position in September 2014 and Gerald Jenkins for such a position in Algeria. Anderson was not considered for either position. Halliburton did not consider Anderson as a candidate for the open Australia positions because, it says, it had existing employees who were qualified for the job whom it chose instead. (Graffeo 30(b)(6) Dep., 62:2 – 63:8). Yet, at the time these positions were filled Halliburton was obligated to rehire Anderson (Graffeo 30(b)(6) Dep., 63:23–64:7) and the MSA did not limit Halliburton's obligation to positions for which it had no qualified existing

---

[11] According to Halliburton, Special Services is a different type of focus area within the services Halliburton provides in the oil field, and Landry was hired for the Process Special Services division. (Graffeo (30(b)(6) Dep., 14:21-16:7)

employees. Halliburton admits it has not considered Anderson for any position with Halliburton since 2014. (Oliver (30(b)(6) Dep., 88:22 – 89:4).

      **P.**  <u>Halliburton Simply Stopped Considering Anderson for Rehire</u>

From March 2014 until May 2014, Anderson had no knowledge concerning his start date. (Pl. Ex. 21 to Anderson Dep.). On June 19, 2014, by way of written correspondence, Halliburton notified Anderson it was not going to rehire him. (Pl. Ex. 20 to Anderson Dep.).

In July 2014 Anderson contacted the EEOC Mediator, Linda Walker, reporting that Halliburton had breached the terms of the mediation agreement by failing to rehire him. Walker sent Halliburton a Breach Notification Letter (Walker Dep., 74:6–17, 83:6 – 11) and on April 7, 2015, a factfinding conference was held to determine why Halliburton had failed to meet its obligations under the MSA. (Pl. Ex. 24 to Walker Dep). Halliburton contended it had fulfilled its obligation under the MSA (Oliver Dep., 34:9 – 24) by making Anderson a job offer, but he failed to pass the pre-employment screening. (Oliver 30(b)(6) Dep., 96:2 – 8). Halliburton admitted it was no longer looking for a position for Anderson. (Oliver Dep., 33:19 – 34:8).

**III.**    <u>LEGAL ARGUMENT</u>

      **A.**  <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only if the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Cartrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The moving party must identify those portions of the record that demonstrate there is no evidence to support the non-movant's case and, as a matter of law, the moving party must prevail. *Celotex*, 477 U.S. at 323-25 (1986). The burden of persuasion is a stringent one that lies with the moving party at all times. *See Celotex*, 477 U.S. at 330-33.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. It is improper for the district court to "resolve factual disputes by weighing conflicting evidence,..since it is the province of the jury to assess the probative value of evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (citations omitted).   Summary judgment is also improper where the court merely believes it unlikely that the non-moving party will prevail at trial. *Boyd v. KLLM Transport Services, Inc.,* 2009 WL 1507567 S.D. Miss 2009)(citing *Nat. Screen Serv. Corp. v. Poster Exchange, Inc*., 305 F.2d 647, 651 (5th Cir. 1962).

As demonstrated below, there are genuine issues of material fact regarding whether Defendant satisfied its obligations under the MSA, and, therefore, Defendant's motion for summary judgment is due to be denied.

**B.  Defendant Failed to Fulfill Its Obligation Under the MSA**

1.  The MSA is Ambiguous as to the Pre-employment Screening Requirement

A contract is ambiguous if it is reasonably subject to more than one meaning. *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 206 (5th Cir.1991). "If a written contract is worded such that it can be given a definite or certain legal meaning, then it is not ambiguous." *Id.* at 407. The issue of whether a contract is ambiguous is a question of law. *Id*. at 406. If a contract is ambiguous, "summary judgment is inappropriate because the interpretation of a contract is a question of fact." *Id.* (citing *Toren v. Braniff, Inc*., 893 F.2d 763, 765 (5th Cir.1990)).

Defendant incorrectly argues the MSA is unambiguous. There is clear evidence that the MSA is ambiguous as to the meaning of the phrase "based on successful completion of pre-employment screening." (Pl. Ex. 10 to Anderson Dep.) The MSA fails to define "successful completion of pre-employment screening." *Id.* Defendant's normal pre-employment screening

consists of the Onboarding Process, which includes Corporate Health Resources, Inc. (CHR)[12] scheduling exams and medical reviews. (LeBlanc 30(b)(6) Dep., 32:9-17). Anderson passed all three exams mandated by Halliburton. (Conte Dep., 73:9-11). Despite Anderson's successful completion of the required exams, Halliburton continued to consult its Medical Director, Dr. Robert Conte. Consulting with Dr. Conte was not part of Halliburton's normal pre-employment screening process. (LeBlanc (30(b)(6) Dep., 13:19-14:6). According to the EEOC's expert, Dr. Charles Yarborough, Anderson successfully completed his pre-employment screening and there was no valid, justifiable reason for Dr. Conte's adverse recommendation. (Ex. P, Dr. Yarborough Expert Report, p. 5) Thus, the MSA is ambiguous because the phrase is subject to more than one interpretation and a jury should determine what is meant by the phrase. *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 206 (5th Cir.1991).

### 2. Because the MSA is Ambiguous, Parole Evidence is Admissible

Even when a writing declares on its face that it is complete, circumstances such as ambiguous contractual terms may justify receiving parole evidence to determine what the parties intended the document to be or mean. *Matthews v. Drew Chemical Corp.,* 475 F.2d 146 (5th Cir. 1973) ("[I]t is not improper for the judge below to have heard parole evidence regarding the intent of the parties as to whether this document was to be a total integration of [Plaintiff's] employment contract.") *See also Bogy v. Ford Motor Co.*, 824 F.Supp.2d 733, 739 (S.D. Miss. 2011)( citing *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.,* 857 So. 2d 748, 751 (Miss. 2003)("If the contract is found to be ambiguous, or if its terms are subject to more than one reasonable interpretation, 'the subsequent interpretation presents a question of fact for the jury.'"); *DartAmerica, Inc. v. MEMC Pasadena, Inc.*, 504 Fed.Appx. 322, 323 (5th Cir. Dec. 26,

---

[12] Corporate Health Resources, Inc. is a nationwide examiner network that provides occupational health exams.

2012)("Whether a contract is ambiguous is a question of law, but once we determine legal ambiguity, the fact finder's interpretation deserves traditional deference"). Therefore, because "pre-employment screening" is undefined in the MSA, parole evidence should be admitted and reviewed to ascertain the intent of the parties.

Defendant made assurances during mediation that establish that the parties intended to avoid recreating the circumstances that led to Anderson's EEOC Charge, i.e. disqualification during the pre-employment screening process based on Anderson's disability. First, Defendant made specific representations that Dr. Conté, the doctor who had previously failed to medically clear Anderson, was no longer part of Defendant's organization. During mediation, Rebecca Oliver, Senior Employee Relations Representative, reassured Anderson and Mediator Linda Walker that Dr. Conte no longer worked for Defendant. (Anderson Dep., 94:12-95:21; Walker Dep., 38:24-40:24). Therefore, the parties did not contemplate Dr. Conté's involvement in any future pre-employment screening. Second, Oliver discussed the pre-employment screening requirement with Walker (Walker Dep., 39:6-11) and expressly stated Halliburton was not concerned about Anderson's underlying medication condition or his upcoming pre-employment screening. (Oliver 30(b)(6) Dep., 39:7-40:21). Oliver represented to Walker that she would personally oversee Anderson's pre-employment screening and rehire process. (Walker Dep., 39:12-40:24). Third, Oliver promised during mediation that Halliburton would find Anderson a job-- whether overseas or in the U.S. (Anderson Dep., 188:22–189:5; Walker Dep., 92:11–93:1).

Based on Defendant's assurances in the mediation, it is clear the Parties did not intend that Anderson would be disqualified to work for Halliburton overseas for medical reasons already known to Halliburton at the time it entered into the MSA, or because of Dr. Conte's concerns. It is also clear that Halliburton's obligation to rehire was not limited to only positions

requiring clearance to work in Iraq. Anderson filed his EEOC charge after Halliburton denied Anderson a job in Iraq because he failed to pass its pre-employment screening. In settling Anderson's EEOC charge, the parties clearly did not intend that Halliburton would once again deny him a job in Iraq because he failed to pass its pre-employment screening *based on the exact same medical conditions in the original EEOC charge.*   The parties intended that Halliburton would rehire Anderson for a position, either in the United States or overseas.

### 3.   Under the MSA, Defendant Was Required to Rehire Anderson

A district court has the "inherent power to recognize, encourage, and when necessary enforce settlement agreements reached by the parties." *Del Bosque v. AT&T Advert., L.P.*, 441 Fed.Appx. 258, 260 (5th Cir. 2011)(quoting *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994)). Moreover, in this case, the MSA expressly gave the court the power to enforce the agreement. (Pl. Ex. 10 to Anderson Dep.). When considering the validity of a settlement agreement in a case involving federal law, the court applies federal law. See *Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984)("Questions regarding the enforceability or validity of [settlement] agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law."). Under federal law, a settlement agreement is a contract. *Lopez v. Kempthorne*, 2010 WL 4639046, at *4 (S.D. Tex. 2010)("The federal law of contracts 'uses the core principles of the common law of contracts that are in force in most states.'")(quoting *Smith v. United States*, 328 F.3d 760, 767 (5th Cir. 2003)(per curiam)). Lastly, federal courts have held under a great variety of circumstances that a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced. *Wilson    v.    Richardson,*    2016    WL    7240148    (S.D.    Miss    2016).

It is undisputed that under the terms of the MSA, Defendant was required to rehire Anderson. After the mediation, all parties agreed and signed a written MSA on January 14, 2014 providing Halliburton would pay Anderson $40,000 and rehire him for a Project Specialist III or comparable position at a base salary of $110,000, conditioned on Anderson passing pre-employment screening. (Oliver 30(b)(6) Dep., 37:7-14).

Halliburton contends that, under the terms of Paragraph 7(B)of the MSA, Halliburton was obligated to offer Anderson a position as a "Project Specialist-Safeguard III; BC503-ESG or comparable position …" (Doc. 78, p. 19). It alleges its obligation was met when it offered Anderson a position on February 24, 2014 as a Prevention Specialist III located in Iraq. (*Id.*) Halliburton argues that Anderson was not hired as a Prevention Specialist III because he did not pass the medical clearance overseen by Dr. Conté. (*Id.* at 20)

The record is uncontroverted that Halliburton agreed to rehire Anderson after negotiating the written terms of the MSA agreeing to do so. Halliburton admits it made the settlement offer because "they [Halliburton] knew of him [Anderson] and could utilize him for work" and "really wanted him [Anderson] back." (Oliver 30(b)(6) Dep., 42:18-21). Defendant now seeks to revoke its promise to rehire Anderson. In this case, the MSA contains an express provision that Defendant will rehire Anderson for a specific position, or a comparable position. During mediation and negotiation of the MSA's terms, Halliburton could have insisted that its obligation be limited to positions outside the United States, limited to a specific time frame, or limited to Halliburton having a specific job opening. Halliburton chose not to do so, and instead undertook the obligation to actually rehire Anderson, not simply offer him one position overseas.

4. <u>There was no Valid Reason for Dr. Conté to Disqualify Anderson</u>

20.

There was no valid, justifiable reason for Dr. Conté to disqualify Anderson for the position in Iraq. Defendant contends Dr. Conté's opinion was individualized, reasonably made, and based upon competent medical evidence (citing *Nall v. BNSF Ry. Co*., 2017 WL 607126, at *21 (S.D. Tex. Feb. 14, 2017)(quoting *Knapp v. Northwestern Univ*., 101 F.3d 473 (7th Cir.1996))(Doc. 78, p. 23).

Unlike *Knapp*, however, as shown below, Halliburton did not make a reasonable assessment based on accurate medical or other information. Additionally, *Knapp* was an ADA case concerning whether a student's heart condition constituted a disability (the court held it did not). This case is a breach of contract claim in which Halliburton was privy to Anderson's medical information, yet assumed the obligation to rehire him, subject to one ambiguous condition.   (Pl. Ex. 10 to Anderson Dep.). Anderson's pain medicine was not a shock to Defendant. As explained below, there was no justifiable reason for Anderson's disqualification.

### a. Anderson Fulfilled the Medical Clearance Standards

Anderson was required to pass a pre-screening required for all international employees. (LeBlanc 30(b)(6) Dep., 21:1-6). In 2014 Ellen LeBlanc, Manager of Global Benefits, was responsible for coordinating the pre-screening process, yet was not made aware this position was a term of a mediation agreement. (LeBlanc Dep., 17:15-20;16:22-17:6). On March 14, 2014, Anderson submitted to a medical exam conducted by Dr. Jerry Welch, a doctor chosen by Halliburton. Dr. Welch cleared Anderson for all positions (onshore and offshore[13]), and in regions with limited medical resources. (Anderson Dep., 134:14-135:1; Pl. Ex. 15 to Anderson

---

[13] Onshore drilling relates to drilling deep holes under the earth's surface to extract natural resources (usually oil and gas)., whereas offshore drilling relates to drilling underneath the sea bed. Nate Richards, *what is onshore drilling versus offshore drilling?* November 22, 2017, http://www.entranceconsulting.com/2013/10/23/onshore-versus-offshore-drilling/.

Dep). Anderson fully disclosed that he was taking Oxycodone[14] and Diazepam on an as-needed

basis. (Anderson Dep., 141:3-142:6). Dr. Welch cleared Anderson to work. (Dr. Conté Dep.,

73:9-11)

Defendant and CHR also sent Anderson to Dr. Ross Ward of Southern Bone & Joint,

who also medically cleared Anderson to work. (Anderson Dep., 156:2-20). Dr. Conté then sent

Anderson for a functional capacity exam (FCE) performed by physical therapist, Cody Rogers.

(Dr. Conté Dep., 63:16-64:7; Anderson Dep., 150:10-151:4). Rogers recommended him for the

position because he could perform all test items without complaints of pain and demonstrated no

limitations. (Anderson Dep., 147:22-152:3; Ex 16 of Anderson Dep).

### b. Anderson Successfully Performed the position in the Middle East and Africa

Anderson worked for Defendant as a Project Specialist-Safeguard II, Firefighting HSE

Supervisor in Algeria and Libya from 2008 until March 2011.  (Anderson Dep. 43:7-14; 51:1-8;

67:3-68:5; Pl. Ex. 3 Graffeo 30(b)(6) Dep). Anderson had no issues obtaining his medication nor

any other medical issues while working in Algeria or Libya. (Anderson Dep., 43:15-44:3;

263:18-24; 264:10-15). In fact, Anderson had the same physical and medical conditions while

working in Algeria and Libya for Halliburton (Anderson Dep. 175:17-176:1) that Defendant now

relies on to assert Anderson is unable to pass the pre-employment screening conditions.

### c. Dr. Conté's Determination that Anderson could not function in Iraq was not medically sound

The expert report and opinion of the EEOC's expert Dr. Yarborough alone is sufficient to

create a genuine dispute of fact. Dr. Yarborough reviewed the medical records and deposition

testimony and concluded there was no valid, justifiable reason for Dr. Conté's decision. (Ex. P,

---

[14] Specifically, at the time of the second medical clearance examination he was taking Oxycodone instead of
Percocet, which contains a combination of acetaminophen and oxycodone. (Dr. Yarborough Report)

Yarborough Expert Report, p. 5) Dr. Conté alleges Anderson was disqualified because of an underlying medical condition. (Conte Dep., 32:1-21). However, Dr. Conte admitted he knew no details concerning what underlying medical condition Anderson had. (LeBlanc (30(b)(6) Dep., 29:7-12).[15]

Defendant cites *Wurzel v. Whirlpool Corp.*, 2012 WL 1449683, at *13 (6th Cir. April 27, 2012) to justify Dr. Conté's opinion. (Def Brief, pp. 25-26). However, the present case is distinguishable from *Wurzel* and the other cases on which Halliburton relies in support of its risk of harm defense. In *Wurzel* the Court concluded the defendant's "decision to favor the recommendation of its own plant physician ... over the recommendations of [the plaintiff's] treating cardiologists ... was reasonable" because the plaintiff's treating physicians did not have complete and current information. The court found no reasonable juror could disagree with the defendant's determination that its employee posed a direct threat to his own safety and of others in the plant. The Court found the Defendant's determination was based on a reasonable medical judgment, it relied on the most current medical judgment and best available objective evidence, and it reflected an individualized assessment of the plaintiff's abilities. *Id.*, at *12. The Court further determined that a reasonable juror could not find there was evidence of a reasonably based medical judgment supporting the opposite view that the plaintiff did not pose a direct threat. *Id.*

Here, however, the EEOC has produced reasonably a based medical judgment, opinions and evidence that are contrary to Dr. Conté's opinion. Charles Yarborough, MD, MPH, FACOEM, FACPM, CIME, a physician who is Board Certified in Internal Medicine and

---

[15] The only evidence Halliburton cites is a letter from Dr. Vivek Barclay, Anderson's pain management specialist, indicating Anderson's use of narcotics for pain management. (Ex. O, EEOC000438).

Occupational Medicine and has been responsible for international workplace health for several multinational companies, disagrees with Dr. Conté's assessment. In his opinion, Anderson was medically qualified for employment and fit for working in regions with so-called limited medical resources although the position in Iraq probably would not fit that description. (Ex. P, Dr. Yarborough Expert Report, p. 5). Dr. Yarborough based his opinion on the health risk of Anderson's job assignment, the medical risks of the destination itself, and the process of the decision-making for medical clearance. (*Id*.). He assessed Anderson was not a "direct threat" as defined by federal regulations to the safety and health of himself or others. Finally, he concluded that Defendant's failure to rehire Anderson due to assumed personal medical threat and risk of the location assignment was unreasonable because the assessments of his medical risk and site resources were inaccurate. (*Id*.). According to Dr. Yarborough, International SOS ("ISOS") operated three medical clinics in Basra, which have 24/7 Intensive Care Units, emergency ward facilities, diagnostic and hospital services, etc. Halliburton also authorizes medical evacuations if necessary. (See Ex. 3 of Dr. Yarborough Expert Report.).

Halliburton admitted during discovery there are medical resources available for its employees deployed in Iraq. Halliburton contracts with International SOS ("ISOS") to provide medical services to its employees in Iraq. (LeBlanc Dep., 39:25-40:14). Dr. Conté admitted that ISOS has clinics all over the world, including Iraq and in remote areas, and Halliburton has contracted with ISOS for many years. (Dr. Conté Dep., 36:24-37:8).

ISOS has the equipment to serve the medical needs of Halliburton employees in Iraq. (LeBlanc 30(b)(6) Dep., 64:13 – 21). ISOS provides case management services to serve the medical needs of Halliburton employees in Iraq. In fact, ISOS has a clinic at the main Halliburton base in Burjasia, Iraq. (LeBlanc 30(b)(6) Dep., 65:22 – 66:7). Dr. Conte did not seek

advice from any representative of ISOS on the use of narcotics and medicine in Iraq. (Conte Dep., 40:24 – 41:3).

Thus, there is conflicting evidence creating a genuine dispute of fact, and Halliburton has not established its risk of harm defense as a matter of law.

5. <u>Defendant Had Positions Available in Areas where Anderson was Medically Cleared to Work</u>

Even if Dr. Conte was justified in failing to clear Anderson, which the EEOC disputes, Defendant had available positions in areas where Anderson was medically cleared to work. Anderson was willing to work any location Halliburton assigned him. (Anderson Dep., 209:2 – 6). In fact, Anderson found jobs on Halliburton's website and notified Graffeo, but never heard back from her. (*Id*., 195:9-20). Dr. Conté admitted Anderson could work in non-Middle Eastern countries. (Conte Dep., 46:25-47:11). Bill Sheridan, Manager of Halliburton's Response Division, told Anderson that positions were available in special services in well control.

On June 18, 2014, Anderson interviewed for an open engineering position in Russia with Roslyn Saulsberry of Halliburton's Engineering Department. (Anderson Dep., 200:4-13; 203:1-4). Anderson had engineering experience from his previous position with CUDD as a Well Control Specialist. (Anderson Dep., 200:14-201:7). During the interview, Saulsberry also acknowledged there were vacant Prevention Specialist positions in the Gulf of Mexico and Australia. (Anderson Dep., 204:4 – 13; 208:1-14). At the end of the interview Saulsberry told Anderson he had the Russia position and she was drafting the offer of employment letter. (Anderson Dep., 202:11-22). Anderson was notified the next day, however, that Halliburton, "would not be pursuing his application." (Anderson Dep., 212:6-19; Ex. C, Def Interrog. Resp., p. 6). Anderson was never offered any of the vacant Prevention Specialist positions in the Gulf of

Mexico and Australia that Saulsberry mentioned during the interview. (Pl. Ex. 20 of Anderson Dep.).

Since May 2014 Halliburton has filled at least five BC-503 (Prevention Specialist) positions in Iraq, Algeria, Australia, and Singapore. (Oliver Dep., 36:8 – 14; Graffeo (30(b)(6) Dep., 46:8 – 16). Halliburton offered Louis Landry a BC-503 position in Singapore in March 2014, (Oliver Dep., 31:12 – 17), despite its obligation to rehire Anderson. In another instance, Halliburton claims that Landry was hired for a special services position[16]. (Graffeo 30(b)(6) Dep., 14:25 – 16:6). Halliburton hired Matthew Hinshaw for an Iraq BC-503 position in September 2014 and Gerald Jenkins for such a position in Algeria. Anderson was not considered for either position. (Oliver Dep., 31:21-32:9) Halliburton did not consider Anderson as a candidate for the open Australia positions because, it says, it had existing employees who were qualified for the job whom it chose instead. (Graffeo 30(b)(6) Dep., 62:2 – 63:8). At the time that Halliburton was filling these available positions, it was under a continuing obligation to rehire Anderson (Graffeo 30(b)(6) Dep., 63:23 – 64:7). Nothing in the MSA limited Halliburton's obligation to rehire Anderson to simply positions in which had no qualified existing employees. Halliburton admits it has not considered Anderson for any position with Halliburton since 2014. (Oliver (30(b)(6) Dep., 88:22 – 89:4).

Halliburton failed to conduct an adequate search for available positions to meet its obligations under the MSA. Halliburton failed to look for positions outside the Boots and Coots Product Service Line (PSL). Graffeo admitted she only looked within the Boots & Coots product service line for a position for Anderson. (Graffeo Dep., 32:12-33:1). However, as a global entity,

---

[16] According to Halliburton, Special Services is a different type of focus area within the services Halliburton provides in the oil field, and Landry was hired for the Process Special Services division. (Graffeo (30(b)(6) Dep., 14:21-16:7)

Halliburton had a plethora of positions comparable to a Project Specialist III position. Halliburton is divided into three divisions: 1) Completion and Production (which includes several product service lines, 2) Drilling and Evaluation Division (which includes different service lines, and 3) Consulting and Project Management. (Graffeo 30(b)(6) Dep., 23:1-15). Halliburton offers multiple product service lines, including: cementing, production enhancement, multi-chem, artificial lift, drilling and evaluation; Sperry, which is directional drilling, and Boots, which is consulting and project management. (Oliver Dep., 11:19 - 12:4).

Halliburton failed to make the terms of the MSA a priority. Oliver was ultimately responsible for finding Anderson a position, delegated the task to another employee and failed to conduct any searches for available positions herself. (Walker Dep., 39:12-14). Oliver instructed Anderson to look for jobs and tell her if he found one. (Oliver 30(b)(6) Dep., 86:17-87:21) Oliver claims she didn't look for jobs on halliburton.com because it wasn't part of her job. (*Id*.)

Despite the MSA's absence of a terminal date for Defendant's obligation to rehire Anderson, Hamilton stopped considering Anderson for Rehire. The evidence shows Halliburton ceased any effort within a few months after Dr. Conté's decision. On June 19, 2014, Halliburton notified Anderson via email it was not going to rehire him. (Pl. Ex. 20 of Anderson Dep.). In a fact-finding conference with the EEOC in April of 2015, Halliburton contended it had fulfilled its obligation under the MSA (Oliver Dep., 33:19-34:8) by making Anderson a job offer, but he failed to pass the pre-employment screening. (Oliver 30(b)(6) Dep., 96:2 – 8). Halliburton admitted it was no longer looking for a position for Anderson. (Oliver Dep., 33:19 – 34:8). By ceasing all efforts to secure a position for Anderson, Defendant plainly breached the contract.

### C. Defendant's Performance of its Obligations Under the MSA Was Not Impossible

Halliburton argues its obligations under the MSA should be excused due to impossibility or impracticality. (Doc. 78, p. 29-30). Halliburton argues it was unable to complete the contract, because evidence shows there were no Prevention Specialist III, BC503 or comparable positions available for which Anderson could be hired between May 8, 2014 (the date Anderson was notified he could not be medically cleared for Iraq) and April 2016 (the date the present lawsuit was filed)." (Doc.78, p. 30) And allegedly, "[u]nbeknownst to Halliburton, and through no fault of Halliburton, Anderson could not be medically cleared to work in any region with limited medical resources." (*Id*.).

### 1. An Impossibility Defense Requires Unforeseen Circumstances

The impossibility or impracticability doctrine excuses a party from performance under a contract if, without that party's fault, an event occurs, the non-occurrence of which was a basic assumption when the contract was made. Restatement (Second) of Contracts § 261. *See also W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. B.C. Rogers & Sons, Inc.,* 696 F.2d 1113, 1115 (5th Cir. 1983). To assert this defense, Defendant must show it had no reason to know at the time the contract was made of the facts on which it relies to prove impossibility. *Nat'l Iranian Oil Co. v. Ashland Oil Inc.*, 817 F.2d 326, 333 (5th Cir.1987). Even then, a party may not rely on the doctrine of impossibility or impracticability "if the event is due to the fault of the party himself." *Id.* (internal alterations omitted). Simply put, a party may not affirmatively cause or fail to prevent the event that impedes the performance. *Nissho-Iwai Co. v. Occidental Crude Sales Inc*., 729 F.2d 1530, 1540 (5th Cir.1984)(emphasis added). *See also Organizacion JD Ltda. v. Dep't of Justice*, 18 F.3d 91, 95 (2d Cir.1994) (impossibility doctrine applies "as long as the party seeking to be excused has

not caused or failed to prevent the judicial action." (quoting *RSB Mfg. Corp. v. Bank of Baroda*, 15 B.R. 650, 654 (S.D.N.Y.1981) (emphasis added).

### 2. Dr. Conte's Failure to Medically Clear Anderson Was Not Unforeseen

Impossibility would require Halliburton to show some unforeseen change of circumstances have occurred through no fault of its own, making performance impossible. Halliburton cannot establish that Dr. Conte's failure to medically clear Anderson was unforeseen because it was completely foreseeable that Dr. Conte would disqualify Anderson a second time for a position in Iraq. Upon investigation of Anderson's EEOC Charge, and prior to mediation, Oliver consulted with Dr. Conté, who voiced alleged concerns about on-the-job safety risks associated with the use of prescribed narcotics and possible physical limitations Anderson may have due to his knee replacement surgery. (Dr. Conté Dep., 57:1-58:16; Pl. Ex. 6 of Dr. Conté Dep.) Knowing of these concerns, Halliburton entered into the MSA obligating itself to rehire Anderson.

During Mediation, Defendant represented Dr. Conté was no longer its employee. (Anderson Dep., 94:21-95:10). Oliver discussed the pre-employment screening requirement (Walker Dep., 39:6-11) and stated Halliburton was not concerned about Anderson's underlying medication condition or his upcoming pre-employment screening. (Oliver 30(b)(6) Dep., 39:7-40:21). Oliver stated she would personally oversee Anderson's pre-employment screening and rehire process. (Walker Dep., 38:24 – 39:11).

In fact, Defendant had prior knowledge of Anderson's medication because he disclosed he was taking Percocet and Valium for knee pain during his 2008 pre-employment screening. (Anderson Dep., 175:17-176:1). Halliburton knew Anderson had medical conditions, was on medication, and that Halliburton had already disqualified Anderson for work overseas, all of

29.

which was discussed prior to resolution of the EEOC charge by the MSA. (Oliver 30(b)(6) Dep., 39:7- 40:21).

### 3.   Halliburton chose not to fulfill its obligation under the MSA

Halliburton could have rehired Anderson as it agreed to in the MSA but simply chose not to. Halliburton takes the erroneous position that its obligation was only to offer Anderson one position and then to stop looking. (Doc. 78, p. 17). There is no evidence Halliburton has, from January 2014 to the present, lacked positions within the BC-503 position code. (Oliver Dep., 36:8- 4; Graffeo (30(b)(6) Dep., 46:8-16). Instead, Halliburton has chosen to hire new employees and transfer existing employees to available positions rather than meet its contractual obligation to Anderson and the EEOC. Impossibility in the context of this case would require Halliburton to show it has gone bankrupt, gone out of business, closed all operations in the gas and oil well line of business, or something of that nature, making it impossible for it to rehire Anderson in the position of a Project Specialist Safeguard, or comparable position. Halliburton has not shown, and cannot show, any unforeseen circumstances to establish a true impossibility defense.

The law cannot protect and reward Halliburton for failing to satisfy its obligation to rehire Anderson under the MSA. Otherwise, Halliburton would reap a windfall by having wrongfully induced Anderson's reliance on its assurances during mediation to induce EEOC and Anderson to abandon claims against Halliburton. In sum, Halliburton's claim to a defense of impracticability/impossibility is without merit.

### D.  The Unclean Hands Doctrine Does Not Apply to the EEOC In This Case

Defendant asserts that even if this Court finds that it materially breached the MSA, its noncompliance should be excused due to the "unclean hands" of Anderson. (Doc 78, pp. 33-34). Defendant argues Anderson's omission of medical information from his Employee Questionnaire

during the pre-employment screen bars the EEOC from requiring Defendant's specific performance of its obligations under the MSA. (Doc 78, pp. 33-34). Defendant's reliance on the unclean hands doctrine is without merit.

1. The Unclean Hands Doctrine is an Equitable Defense to a Request for An Equitable Remedy

The doctrine of unclean hands is an equitable defense to equitable relief. *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co*., 324 U.S. 806, 814-15 (1945) ("[H]e who comes into equity must come with clean hands."); *see also* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2946 (1973 & *21 Supp. 2001). The Fifth Circuit has described the doctrine of unclean hands as follows:

> The doctrine of unclean hands is an equitable defense which provides that a party must have acted fairly and justly in its dealings with another in order to assert a cause of action against that party. A party is said to possess "unclean hands" if it is guilty of conduct involving fraud or bad faith.

*Alcatel USA. Inc. v. DGI Technologies, Inc*., 166 F.3d 772, 796 (5th Cir. 1999). This is a breach of contract action for which the EEOC seeks damages, as well as specific performance. (Doc. 15). Even if the doctrine of unclean hands could apply to the EEOC under the facts of this case, which EEOC disputes, the doctrine could not apply to the EEOC's claim for damages.

2. The Unclean Hands Doctrine Does Not Apply to the EEOC

The EEOC has brought this lawsuit against Defendant for its failure to comply with its obligations under the MSA. First, Defendant makes no argument the EEOC, which is the Plaintiff here, has unclean hands. Second, Halliburton cites no authority for the proposition that a suit brought by the EEOC for breach of an MSA can be barred by some omission by a charging party. When the government acts in the public interest, this doctrine is unavailable as a matter of law. *U.S. v. Philip Morris, Inc*., 300 F. Supp. 2d 61, 75 (D.D.C. 2004); *U.S. v. New York*

*Metropolitan Transp. Auth.,* 2006 WL 708672 at *2 (E.D.N.Y. Jan. 12, 2006); *see Karpenko v. Leendertz*, 619 F.3d 259, 269 (3d Cir. 2010)(Aldisert, J., dissenting)(conceding the unclean-hands doctrine is inapplicable to litigants who represent the public interest). Due to the compelling government interest in eradicating employment discrimination and vindicating the rights of discrimination victims, applying the unclean hands doctrine here would disserve the public interest and "place a potent weapon in the hands of employers who have no interest in complying voluntarily" with antidiscrimination laws. *EEOC v. Recruit USA, Inc.*, 939 F.2d 746, 753-754 (9th Cir. 1991).

   3.   Even If the Unclean Hands Doctrine Was Applicable, Defendant Has Failed to Establish Willful Misconduct

Here, the record reflects no willful misconduct. At Defendant's request, Anderson submitted to pre-employment screening that included an Employee Questionnaire. (Anderson Dep., 141:3-15). Anderson disclosed his previous knee surgery and use of pain medication. (Anderson Dep., 135:21-136:4) Anderson recalls completing the Questionnaire and had "nothing to hide." (Anderson Dep., 141:16-142:6). There is, at the very least, a genuine dispute as to willfulness. Anderson did not fail to disclose any material information. The material inquiry here was not whether Anderson ever had a past injury or illness, but rather whether he could presently perform the job Halliburton offered. Both Dr. Welch's opinion and the FCE which Anderson passed are evidence that Anderson was physically capable of performing the job. (Pl. Exs. 15 & 16 to Anderson Dep.) He had successfully performed the job in the past in Libya and Algeria. (Anderson Dep., 42:14-43:5) EEOC's expert, Dr. Yarborough, says there was no valid, justifiable reason for Dr. Conte and Halliburton to believe otherwise. (Ex. P, Dr. Yarborough Expert Report, p. 5). At the very least, there is a genuine dispute of fact as to unclean hands.

There are no unclean hands in this case. The evidence demonstrates only that Defendant, has not complied with the terms of the agreement- to rehire Anderson as a Project Specialist III 503 or comparable position.

**IV.    CONCLUSION**

For all of the reasons stated herein, Defendant's Motion for Summary Judgment should be denied.

Dated this the 27th day of November, 2017.

/s/Harriett Oppenheim
HARRIETT OPPENHEIM
Senior Trial Attorney
(MS Bar No. 103149)
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Dr. A. H. McCoy Federal Building
100 W. Capitol Street, Suite 338
Jackson, Mississippi 39269
Tel.: (601) 948-8454
Fax: (601) 948-8401
harriett.oppenheim@eeoc.gov

Kurt Fischer
(ASB-9772-R72F)
Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Birmingham District Office
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, Alabama 35205
Phone: (205) 212-2043
kurt.fischer@eeoc.gov

ATTORNEYS FOR PLAINTIFF

33.

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2017, I filed the foregoing Memo in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will electronically send notification of the filing to all attorneys of record:

> CHRISTINE S. KEENAN, T.A. (MS. #10756)
> JEREMY J. LANDRY (admitted *pro hac vice*)
> THE KULLMAN FIRM, PLC
> 4605 Bluebonnet Boulevard, Suite A
> Baton Rouge, Louisiana   70809
> Telephone: (225) 906-4250
> Facsimile: (225) 906-4230
> E-mail: csk@kullmanlaw.com; jjl@kullmanlaw.com

> And

> TAYLOR B. SMITH, (MS. #7613)
> THE KULLMAN FIRM, PLC
> P.O. Box 827
> 119 3rd Street South, Suite 2
> Columbus, Mississippi 39701
> Telephone: (662) 244-8824
> Facsimile: (662) 244-8837
> E-mail: tbs@kullmanlaw.com
> ATTORNEYS FOR DEFENDANT

Dated this the 27th day of November, 2017.

> */s/Harriett Oppenheim*
> HARRIETT OPPENHEIM
> Senior Trial Attorney